This case on Block 2-17-0243, people in the state of Illinois, Plaintiff's Appellee v. Van Muren, Defendant's Attorney. Arguing on behalf of the Defendant's Attorney, Mr. Douglas H. Johnson. Arguing on behalf of the Plaintiff's Appellee, Mr. Edward Randall Seneca. Mr. Johnson. Mr. Johnson, before you begin, you had requested access to certain exhibits. Yes. Did you bring those back today? I did not. I spoke with the clerk and we'll get those back today, absolutely. Certainly by tomorrow morning, today if possible. Without question, Your Honor. Okay, go ahead. Mr. Van Muren is currently serving a 14-year sentence pursuant to a second-degree murder conviction and six years on his arson conviction. His two arson convictions were merged. I'd like to address issues four and five. They're related in the brief today. Four is a sufficiency of evidence argument on the arson conviction. I think the State agrees that the issue here is, and we certainly believe it is, what did the Defendant know? What was he practically certain would happen when he put those papers in the toaster? This isn't the normal way people start fires. And for this particular crime, to submit that is what he needed to know. Am I going to damage this dwelling? Is it practically certain that I will damage this dwelling if I put these papers in the toaster? And I submit to you at this time, he was out of his mind. He was certainly intoxicated. Speaking of out of his mind, at his statement and elocution, the Defendant said that he wanted to have an insanity defense raised. And he spoke to his attorneys about that. I'm paraphrasing. And he said that that was not raised against his wishes, correct? In his statement and elocution, yes. And the trial court didn't stop and interrupt and question the Defendant, because the Defendant said he had other due process issues he wanted raised, correct? Correct. What should the trial court have done at that point? At the statement and elocution? Yeah. We don't raise any issue with regard to that. Are you familiar with Crankle? I am. And obviously you've discussed and consulted with trial counsel? I've discussed and consulted with trial counsel. I have with my client. In fact, you were already retained before the sentencing, correct? I am not sure. I know what you're referring to, because it was a statement made about our firm. You didn't put that in your brief, the statement about your firm. When you said that the trial court denied the Defendant the opportunity to proceed pro se, shortly after that, the Defendant mentioned your firm, correct? Yes. That's not in your brief. Okay. Should it have been in your brief? I believe it's in the record. I don't know if it should or not. Well, you know what 341 requires, right? An accurate statement of relevant facts. Isn't the fact that he had other counsel already retained relevant to whether or not he wanted to proceed pro se? I believe I will say this, Your Honor. At the time he made the statement during the trial, we were not retained. Okay. And I'm certain of that. Okay. I am not certain as to whether or not we were retained, even at sentencing, but I certainly had communications with my family. Okay. In any event, you're not raising that issue at this point? No, Your Honor. Okay. Let me follow up on your question regarding the arson. I think you allege or, you know, convey in your brief that the defendant is trying to burn up the papers to cover up the fact that he was in the residence, correct? Or words of that nature. He wasn't trying to burn the place down. Not trying to burn the place down and not trying to damage the place. At most, was he practically certain that the papers would be destroyed? At most, that's what he. Isn't there a mental element of knowledge rather than certainty? Knowledge? Knowledge defined as practical certainty. Okay. Well, how is his goal relevant, the ultimate goal relevant to the fact that he knows that the place could burn down? I mean, even assuming he's not trying to intentionally burn the house down, okay, and he's just trying to cover up his presence there by burning the papers and the toaster, is his goal relevant? I've thought about that a lot. Is his intent relevant to his knowledge? And I believe it is relevant, but it's not a conclusive factor. Well, that's tied into the whole thing. All of that set of facts is tied into leaving the gas on, the born supremacy tape, and, you know, so it's not just that he put the papers in the toaster, correct? There's other evidence that indicated that he may have or that he knew what might happen, correct? Well, looking at the other evidence, the oven, the stove, in his statement he has asked, what were you doing, because the detectives were continuously in our position, I believe it's appropriate to tie this movie to this scene, and they said maybe on the second day in the 1030 time frame around there, what about the gas thing? What were you doing with those knobs? And the defendant said at that time that I was just putting on the stove to put more, he didn't say stuff, S-H-I, I was putting on the stove to put more stuff in there. Again, showing he wanted to destroy the papers. He said, I was freaked out and I just didn't turn them off. During that entire extensive interrogation, he never said, I saw Jason Bourne, I wanted to do this, this was my plan and I knew it would occur, I really thought this was going to happen. He never says that. He says, with regard to the stove, I didn't know what was going on and I turned them off. He also says when I left, I didn't think that place was going to blow up. He also says, he suggests, that would have been crazy, I still had to go up and get my Xbox. We knew that he was leaving the residence, he was packing things up, but at the time this went down with the toaster and messing with the knobs, he was planning to still get his Xbox and leave. So, and with regard to the garage, since we're talking about the other fighters, in the garage, he says, well, I pulled out my lighter, because I had some papers with numbers on it and I burned it. And the detectives said, oh, were you trying to, and the detectives appropriately, I'm not saying anything wrong with that, they're trying to see, did you know, or certainly they, I think, were concentrating on intent, what were your intentions? Did you see this movie, was this your intention? And he said, no, no. I lit those papers on fire, he said, I think if you watched the interrogation, they didn't know anything about this one. I think the detective starts taking notes or maybe even calls back to look for what's going on in the garage, because the defendant said. He watched the fire in the garage. He watched the fire and he wasn't burned out. There was none in the garage. I don't think there was any damage, there's nothing else damaged. So, he, all we have is the toaster, and I don't believe. Well, you have the toaster and the gas on. Well, he said, he had no intent with the gas. Well, regardless of what he said, the trial court, as a fact finder, is entitled to take the evidence as he views it, correct? I think it has to be, he has to interpret that evidence reasonably. And this gets into issue five, the Bourne movie had nothing to do with this. Let's keep them separate for now. I mean, he's on an irrelevant issue here. Knowledge intent is something that the trier of fact has to infer from the actions of the participant, correct? Correct. You don't see the knowledge and intent. So, where did the trial court go wrong in, you know, believing that his intent was to damage property? Well, first of all, although they are related, the question isn't his intent. The question is his knowledge. Well, knowledge, correct. And the trial court went wrong when it determined that Grant Van Muren knew at this time that this, putting the papers in the toaster, was going to do anything beyond damage those papers. That's not how one starts a fire and does damage to a dwelling or a residence. Did he have it set on dark or light? I'm not sure. I'd have to go back to the pictures. Bottom line, it was the papers burned and they charred and did some damage to the cabinets above it, correct? They charred, yes, and the pictures show us. I saw the photographs. It's clear there was damage. Charred. And that's all that's required for purposes of arson, correct? Yeah, I'm not arguing the damage amount. Personal property, I believe, the papers were worth less than $5,000. Let's turn to your due process claim, the alleged destruction of evidence. Do you have any authority for the proposition of the police officer's statement to a defendant, a statement of opinion, even if false? Could it possibly be considered destruction of exculpatory evidence? Certainly a police officer can lie to a defendant. Under very specific circumstances in this case, the point that we are making is that the officer then, by saying to the defendant, it would be out of your system now, that not only changed the defendant's decision-making process to not have his blood checked for maybe if someone slipped him a Mickey or not, but also changed things down the road. Well, not to put too fine of a pointer, how do we know in the real world that Caruso was wrong? Where's the evidence that establishes, and he was making it up, admittedly, but how do we know that he was wrong? We know he didn't know. Yes. Because we have a subsequent trial. Right, but is that the same thing as deliberately suppressing evidence? It could be recklessly suppressing evidence. Well, you have to have bad faith. It has to be an intentional act by the law enforcement officer under Arizona v. Youngblood. You recognize that, correct? I do recognize that. And so, you know, in Arizona v. Youngblood, the United States Supreme Court said that the requirement of showing bad faith on the part of the police limits the extent of a police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it. That is, those cases in which the police themselves, by their conduct, indicate that the evidence could form the basis of exonerating the defendant. And here, Caruso could not have known that the evidence in the defendant's system could lead to exoneration. I would submit that he absolutely, I disagree that he could not have known. Where's the bad faith? Where's the proof of bad faith? We have such crucial potential evidence here that... Potential doesn't cut it under Arizona v. Youngblood. It has to, you have to show that there is bad faith, that the police knew the potential for the exonerating evidence. It's like replacing or losing a spent shell casing or a bullet from a body that could have exonerated. There are a host of examples where the police, you can show that the potential is there, that there is a potential exonerating circumstance. And here, what did the police know? The police had investigated the scene. They apparently would have known about what they saw there, and they would have had a very, very good idea that whatever happened here with this drunken brawl could have... Can I say 100% certainty? I think it gets back to what Noah said. I can't tell you that they knew with 100% certainty that Grant Van Muren had been slipped something. And you acknowledge in the reply brief this issue was forfeited, correct? It was not raised in the trial court. But yes, we raised plain error in the reply. Here's where I'm wrestling with, aside from the Arizona v. Youngblood requirements, which is a legitimate question to raise, a lot of this evidence seems to be outside the record. Wasn't this something that would more likely flow into a post-conviction? And we don't even know the answers to some of these questions. You're saying this could potentially, it's speculative. How is this state of the record if we addressed it head-on? How would this be sufficient to rule in your favor? The differentiating factor here, or the uniqueness of this case, just has to do with the fact that the detective told Muren at the time it would give a standard statement, and then later at trial testified, I don't really know. But what if it was true, what he said was true? How do we know it isn't what Caruso said was true? He admitted he made it up, but he said it could be a day or two. Maybe it only stayed in the system for a day or two. We don't know the answer, do we? No, Your Honor. So how can we conclude that it should be reversed because Caruso gave him false and misleading, intentionally false and misleading information? How do we know that's true? As I mentioned before, the best I can tell you is that due to the crucial nature and the dispositive nature of this evidence, that it was, it showed reckless indifference to the due process rights of the defendant to tell him that this would not be the system and not pursue this. And what's the relief? What's the relief? This evidence can never be identified. It can never be shown, unlike other situations where the evidence does exist and it's destroyed or did exist at some point in time. We have no idea whether this evidence even ever existed, correct? Correct. Even the defendant doesn't know whether it exists. Well, that may be evidence. That may be evidence. The fact that he does not know, perhaps we're talking about a blackout situation, that may be evidence that our position would be that it's evidence that indeed it did happen. Let me ask you this. In your brief you cite Caruso, correct? H-A-R-I, Harry, the Harry case. In that case, the court found there was no error in declining to give an involuntary intoxication instruction where the evidence introduced by the state rebutted the defense, right? Right. And here your client had a clear memory exhibited not just on the tapes but also in his statement in elocution. He related again what took place in his sharp, clear memory, correct? I submit the statement in elocution shows anything but a sharp, clear memory. I think it shows something far different. Correct. Well, he recalled and told the court what had taken place, correct? He made representations to the court in a statement in elocution that he chose to provide them with. And he also discussed the fact that he had wrestled with his older brother when he was young and he was outweighed by the defendant by approximately 150 pounds, yet he was able to overcome the victim's efforts through his wrestling experience, right? Yeah. I have not reviewed the statement in elocution, but I certainly believe you're correct. Yeah. And your theory is that he may have been under the influence of barbiturates. Isn't that evidence inconsistent with somebody who's under the influence of barbiturates? Again, the statement in elocution, I don't. Well, you're the advocate. You're the appellant. It's in the record. It's the defendant's statements. Isn't that inconsistent, overcoming a man twice your size, inconsistent with being under the influence of barbiturates? I think as an advocate, I do not have to vouch for the veracity of the statement in elocution. I believe the defendant's statement during the interrogation over the nine hours is consistent with being under the influence of barbiturates. I have one question about the issue you didn't specifically address in the oral argument. Obviously, as you know, to constitute self-defense, there has to be force threatened, and the danger of harm has to be imminent to the defendant. Correct. My question is when the defendant admitted that he finally got up the courage to hit the victim over the head with the tray, the victim is sitting, as I understand it, at a seat facing a wall or facing a computer. His back is turned to the defendant. So what imminent threat of harm was he posing to the defendant when he's sitting at a seat and his back is to the defendant? Where is the imminent risk of harm? I think what we have here is a situation. Who knows if he can try to leave, he's going to get there. I certainly don't want to sit here and bash the victim, but this man was a dangerous man. I think the record does show that. And so we have someone who's much smaller. Yes, without question, there is what could be called a cooling off period. By the defendant's almost own admission, didn't he say he finally got the courage up over his head to hit the defendant, hit the victim? He said many different things in that statement. But he did say that. He did. He got the courage up. He used different terms, absolutely. He said, I got the, yes, he said I grew his whatever. Yeah. And, yeah, he did say that. Okay. Thank you. I have one question or two. Am I correct in thinking that you felt that the victim's underpants should have been preserved? Yes. Best case scenario, what would it have proved if it had been forensically examined? I think all of the evidence, anything we could learn about this fight and what happened. Based upon the description of the underwear that was not forensically examined, but apparently was destroyed through either indifference or negligence or malintent, what element in the crimes that he was charged with would the underwear relate to? Well, I think that there are different stories told during the interrogation with regard to whether or not there was a sexual component to what happened here. And if the underwear contained evidence of a sexual act, that may add fuel to the defendant's argument that this was a self-defense. It would give us more of his mindset, if indeed the story about I was raped and I took actions after that. Is anyone, is the State challenging that there was some sexual, there was not some sexual component to this? That seems pretty clear, doesn't it? I'm not sure the State, I think the State's position is we don't need to show whether there was or whether there wasn't. What we have to show is that he didn't act in self-defense and his belief was not reasonable in what he did. Right, but nobody's really disputing there was some sexual overtones here, are they? Well, I don't think from the record we can tell whether or not there were sexual overtones or not. What about the defendant's own statements? He said different things. In one statement he said that he was digitally penetrated by the defendant. Yes, he did. He changes up throughout the two days. So to Justice McLaren's point, we really can't tell what that evidence might have or might not have shown, correct? Well, for instance, best case scenario, if we found evidence of a sexual nature in the underwear, that would bolster for sure. Could you be a little bit more specific? If we found semen in the victim's underwear, that would show. Some sort of semen or prejaculate or something like that. I mean, when I say best case scenario, I mean you tell me in terms that are not vague and indefinite. And when you say evidence of sexual activity, that's about as vague as I think you could possibly get while still referring to sex. Okay, how about the victim's ejaculate or the defendant's ejaculate in the underwear shows that there absolutely 100% physically was a sexual attack upon this victim. I think that could change a fact finder's mind about whether or not what the defendant's mindset was. So let's take this somewhat further, and the idea is that the defendant's DNA would have been found in or on the underwear? You said to be specific, either one. But sure, the defendant's DNA on the underwear. Semen is the source. Okay. Thank you. Thank you. You'll have time for rebuttal. Mr. Pacinica. Good morning, Your Honors. May it please the Court, my name is Randy Pacinica. I'll be arguing on behalf of the people in this matter. If I could, the defendant focuses his argument on the sophisticacy of the evidence of the arson conviction, so I would just like to address that first. In cases where a defendant doesn't testify and gives multiple pretrial statements that are inconsistent with one another, which is what happened here, if any of the defendant's statements support the eventual verdict of the trier of fact, the defendant's bound to those statements. That's just the way it plays out, because the trier of fact is free to believe them, and under the Collins standard, Your Honors have to view the evidence in the light most favorable to the people, so you have to assume that the trial court believed these statements of the defendant. And in this case, the statements regarding arson that he made was, he put a bunch of papers in the toaster, we know the toaster is directly below the cabinet, he turned the gas on, and he did this in part, he says, to ensure the victim was dead. And that's in People's Exhibit E at 102430. Question from the detective, why do you think you were burning? Like, were you mad that you were burning? You wanted to burn the whole place down? I kind of wanted to, this is the defendant, but that wasn't my goal. You kind of wanted to, the detective says, because it would kind of destroy anything that was going on there? And this is the defendant. No, because it would totally make sure he was dead. So he had in his mind that he wanted to either blow the place up or burn the place down. Obviously he wanted to do more than just burn some papers in the toaster. Yes, yes. And he charred, fortunately, he only charred the cabinet in his efforts, but that's enough for the arson conviction. That's open and shut. That's the end of that discussion. The due process violation, I don't know why that's in the defendant's brief. It's really silly. And he admitted that he took Klonopin. The defendant doesn't put that in his brief. Your Honor didn't mention it, but he admitted he slipped himself Mickey. If he passed out, he says it's because I took a Klonopin. Was it prescribed to him? No, he said he got it from a friend. So to the extent he was slipped a Mickey, he slipped it to himself. Some phantom due process violation, it's silly. I don't know why. Well, if his theory was correct, how silly would it be if, in fact, the victim had given him something, right? And he's saying that the police then dissuaded him deliberately, although we don't know if that's been established in the record. If that was, in fact, the case, and as Justice Berkut has opined, there was some bad faith intent on the police that deterred him from that, that wouldn't be that silly under those circumstances, would it? I think you'd need more than that. You would need him not admitting that he slipped himself a Mickey. Well, the police would have to know that there's potential for exculpatory evidence in his system, correct? You would need to know that, too, which there's no evidence of that either. But the fact that he made a statement that he thought that Mr. Clark might have put something in his drink, isn't that enough to show bad faith? No, it's not close enough when he's admitting that he took it himself. He voluntarily took something that he says caused him to pass out. I mean, that was part of the statement. The police heard that. The trial court heard that, was free to believe it. That's the end of that. What do you – it's not discussed in the briefs, but shouldn't the trial court have cut the defendant off or not cut the defendant off, but instead inquired into what his other claims were regarding the issues that the trial counsel did not allow him to raise? Regarding the defendant's claim. Yes. Shouldn't the trial court have said, look, I saw that in the statement of elocution. I ruffled through the defendant's brief to make sure there was nothing about potential critical inquiry. I know we've had a recent remand for critical inquiry. There's nothing in there. I can't – I mean, I'm not going to raise the defendant's argument. But the defense counsel just said he reviewed the record and didn't see any basis for ineffective assistance. Exactly. And he didn't raise one. And to the extent that one might be raised in post-conviction, I guess we'll see. But there's no relief to be had on that issue on appeal. Well, the defendant's statement of elocution was sort of a long, rambling, almost human cannabis, wasn't it? Yeah. I'm not sure you could call it anything specific. Yeah, he said a lot. He said a lot of different things. Let me ask you a different question. Did the trial judge impose a duty on the defendant to retreat here, sua sponte? Definitely did not. Those cases are when there's mutual combat. You can't impose a defendant from retreating when they're engaged, when the victim and the defendant are engaged in mutual combat. That's not what happened here. By defendant's own admission, and, again, it's a statement he made, it's a statement he's inextricably bound to, the victim went and took a shower. He was left alone for at least 15 minutes, the victim, alone. Could have called the police, could have left. He waited for the victim to come back, and then he attacked the victim. So this is not a case of mutual combat in which the trial court impermissibly imposed a duty to retreat. The trial court said he could have done other things. Does the defendant have to leave the premises? No, but the trial court's finding was he could have done something else. He had his phone. He could have called the police. But the fact that he didn't, how does that interplay in the issues in this case? Well, that shows that his belief that he needed to defend himself by bashing the victim in the head with a table wasn't reasonable because he could have done other things. I mean, that's the way it played out for the trial factor, Judge Thelander, and I don't see how. There was clear evidence that the defendant sustained multiple injuries, correct? The defendant? The defendant. Yes. There were bite marks on his back. He had bruising on his shoulder. Yes. He had injuries to his face. His eye had a huge, not necessarily huge, but a large injury. And by a defendant's own statement, those injuries occurred after he bashed the victim on the head with a table. I'd be happy to address any other questions you might have. In any event, the question of the defendant's intent and knowledge at the time of the commission of the offense is really a question of fact and an inference to be drawn by the terror of fact. That is 100% correct, Your Honor. Thank you. Thank you. Mr. Johnson, rebuttal. With regard to intent and knowledge, they point to, I suppose appropriately, the portion where the police officers continue to pursue this movie, continue to pursue the gas issue, and the police officer says, you wanted to burn the place down. And as counsel said, the defendant said, I kind of wanted to, but that wasn't my goal. It wasn't his intent. All over that statement is, I didn't leave there thinking the place was going to burn down. And as it goes on and on in that statement, and again, intent isn't the issue, and what he wanted to do isn't the issue. Knowledge is the issue, and there was just no way that he should have known what was going to happen from what he did. Why would he turn the gas on in the first place? He says it. He says, because he put papers in there. I did it to put more stuff in there. They ask him. And they're suggesting to him again, and the defendant had no reason to deny this movie connection. So you're telling me that it was a gas oven? I think it's unclear for the record what this thing is. Oh, it's a gas oven. But we did have a smell. Well, if it's a gas oven, does it have gas burners on the top of the stove? Yes. Does that mean this defendant at that time understood the way gas works? No. Well, at this time, does the defendant understand that if gas burners are on, they do a marvelous job of burning paper, and that typically the tops of stoves are impervious to most incidental flames caused by either the gas flames coming from the burner or from ancillary paper. So my point to you is, based upon my common everyday experiences in life, if it's a gas stove and you want to burn something, if you want to burn it quickly and it's combustible and not edible, you do it on the top of the stove, not in the oven. I believe your knowledge base, Your Honor, having been before you on several times, is far different than this defendant's. So the average defendant in his knowledge of physics? I think maybe, yeah. I'm just taking a shot there. You're taking judicial notice of him? Yes. This defendant, defendant's exhibit number one, we have lighter fluid. The defendant had a lighter. He wanted to do something beyond it. He's putting papers in it. He's out of his mind, although he can say, I put burned papers in the garage, nothing else happened. The movie had nothing to do with it, but the state felt it did. They opened their closing argument about the defendant wanting to start a case in Boyne. So it could seem trivial, but that is what got it. Go ahead. Our standard review for an evidentiary ruling is a piece of discretion,  On issue five, yes. Thank you, Your Honor. This may be inane, but was there any metal waste paper baskets found in the house? I am unaware, Your Honor. Thank both parties for the quality of your arguments this morning. The case will be taken under consideration. A written decision will be issued in due course.